IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:10-CR-280-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| SHARIF SAFWAT EZZAT, ) | |
| ) | |
| Defendant. ) | |

This case comes before the court on defendant's motion to suppress (D.E. 33). Defendant's memorandum was incorporated into the motion. The government filed a response in opposition as part of a collective response to several motions by defendant (D.E. 39 at 3-4). The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 1 Mar. 2011 Docket Entry). For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

Defendant, who is confined to a wheelchair, was an inmate at the Federal Correctional Institution II-Medium in Butner, North Carolina ("FCI II"). (Def.'s Mot. ¶ 1). On 18 August 2010, he was indicted for possession of contraband in prison in violation of 18 U.S.C. § 1791(a)(2). (Indict. (D.E. 1)). Specifically, defendant was charged with possession of three shanks uncovered during a 13 September 2009 search of his wheelchair. (Def.'s Mot. ¶ 1).

On 31 January 2011, defendant filed the instant motion to suppress. The motion seeks suppression of allegedly inculpatory statements he made to his assigned case manager, Brandi Kaz ("Kaz"), when she visited his cell on 27 April 2010 on the grounds that he was not given the warnings provided for by *Miranda v. Arizona*, 384 U.S. 436 (1966).

On 16 March 2011, an evidentiary hearing on defendant's motion was conducted before the

undersigned. (D.E. 45). At the hearing, the government presented the testimony of Kaz. Defendant presented the testimony of Lieutenant Scott Allen Gregory ("Gregory"), an officer with the Special Investigative Supervisor's office at FCI II. The court admitted the two exhibits offered by defendant without objection by the government (*see* Exhibit List (D.E. 46)): a 13 September 2009 Administrative Detention Order issued by Gregory against defendant for possession of weapons (Def.'s Hrg. Ex. 1 (D.E. 56)); and a 20 April 2010 memorandum regarding "Delay in Disciplinary Process" from Gregory to the Warden of the Butner Federal Correctional Complex providing information on the status of defendant's disciplinary case (Def.'s Hrg. Ex. 2 (D.E. 57)).

## FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

At all times relevant to the motion, Kaz was assigned as defendant's case manager. (Transcript of Hearing ("Tr.") (D.E. 52) 37:21 to 39:6). The duties of a case manager include processing inmate transfers, ensuring that an inmate is housed in a facility appropriate to his security level, performing the biannual reviews required for each inmate, and assuring that inmates are housed separately when required. (Tr. 38:3-15).

On 13 September 2009, Kaz was in the office of a lieutenant with the Special Investigation Unit when a wheelchair used by defendant was brought in to be searched. (Tr. 39:7-23). The search was prompted by information obtained by one of the corrections officers that shanks, which are homemade weapons, were being held in wheelchairs, including defendant's. (Tr. 39:24 to 40:6). As part of her general duties as a staff member, Kaz conducted a search of the wheelchair. (Tr. 39:12-23). During the search, Kaz found two shanks inside the frame of the wheelchair and one in the seat cushion. (Tr. 40:17 to 42:1). Kaz then put the shanks in a secured lock box for the Special

2

Investigation Unit and wrote an incident report for the violation of the institutional rule against possession of weapons. (Tr. 42:10-21). Pursuant to FCI II policy, Kaz, as the author of the incident report, was not permitted to further participate in the investigation of the violation. (Tr. 42:22 to 43:9).

Following the search on 13 September 2009, Gregory issued an Administrative Detention Order placing defendant in administrative detention in a special housing unit ("SHU") until the conclusion of the investigation into the weapons possession violation. (Def.'s Ex. 1; Tr. 90:19 to 91:1). Except for time defendant spent in the Federal Medical Center, he was housed in a SHU until his disciplinary hearing on the weapons possession violation on 13 May 2010. (Tr. 69:22-24; 95:11-18). On or about 17 September 2009, Gregory, whose duties include investigating incidents at FCI II that might be referred out for criminal prosecution, referred the incident report to the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office in Raleigh, North Carolina for possible prosecution. (Def.'s Ex. 2; Tr. 87:13 to 88:4; 93:24 to 94:22). On 9 November 2009, the FBI notified Gregory that the United States Attorney's Office had agreed to present the case to the Grand Jury. (Def.'s Ex. 2; Tr. 102:19-23). At no time did the FBI direct Gregory or anyone else at FCI II to question defendant regarding the case or to otherwise conduct an investigation. (Tr. 108:24 to 109:15). Neither did the FBI conduct any investigatory activities at FCI II. (Tr. 109:16-25).

Although Kaz remained assigned to defendant as his case manager following the search in September 2009, she did not speak to him again until 27 April 2010. (Tr. 43:10 to 44:4). Her reasons for not communicating with him during this period were that she feared he was angry at her because of her involvement in the search and because she did not want to jeopardize the integrity of any ongoing investigation into inmates' possession of weapons. (Tr. 44:2-18).

3

On 27 April 2010, Kaz was informed by her unit manager that defendant had asked to speak with her. (Tr. 44:19-23). As part of her duties as a case manager, Kaz is required to perform weekly rounds in the SHU during which she goes door to door to determine if any of the inmates assigned to her have any issues or need to speak with her. (Tr. 44:23 to 44:5; 56:8-10). Accordingly, in response to defendant's request, Kaz stopped at defendant's cell in the SHU during her rounds. (Tr. 44:23 to 45:7; 46:2-13). Defendant rolled his wheelchair to the door and initiated the conversation saying, "'Hi, how are you? Why haven't you come seen [sic] me?'" (Tr. 45:8-13; 46:14-17). Kaz told him that she thought he would be angry with her. (Tr. 47:7-18). Following some additional general conversation, defendant told her, "'I ain't mad at you, I know somebody snitched on me.'" (Tr. 45:14-18). Kaz responded, "'[W]hat makes you think somebody snitched on you, I was doing my job.'" (Tr. 45:19-21; see also Tr. 78:4-12). Defendant then stated, "'[C]ome on Kaz, how would you know those were in there, I know somebody snitched on me.'" (Tr. 45:22-24). Kaz did not administer *Miranda* warnings to defendant prior to the exchange with defendant. (Tr. 47:1-6; 68:8-12).

On 8 March 2011, Kaz was in her office when she was informed by her secretary that defendant wanted to speak with her. (Tr. 50:2-8 ). Kaz told her secretary to tell defendant that it was not open house, which is a block of time during the day when inmates can meet with case managers. (Tr. 50:81-12). When defendant insisted that it was an urgent matter, Kaz permitted the meeting. (Tr. 50:12-14). During it, defendant told Kaz that he wanted to dispute a rumor that she would be assaulted by him or that he would put a "hit" on her if he was ultimately convicted of the weapons possession charge. (Tr. 52:5-14). Defendant reiterated that he knew someone had snitched on him and that he was angry with the snitch, but not with her. (Tr. 51:12 to 52:4). Kaz informed defendant that she was not going to discuss the case with him. (Tr. 51:20-23).

4

Case 5:10-cr-00280-FL   Document 58   Filed 05/05/11   Page 4 of 13

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS UNDER *MIRANDA*

#### A. *Miranda* Safeguards Generally

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To protect this right, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) established rules governing custodial interrogations. 384 U.S. at 479. "The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980).

*Miranda* requires that, prior to questioning, a suspect who is in custody must be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* Interrogation may proceed only if the person lawfully waives his rights. *Id.*

*Miranda* conditions the admissibility at trial of any custodial statements on compliance with the warning procedure. *Id.* "'[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.'" *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608 (2004)). The exclusion applies to the government's case-in-chief, but not necessarily other uses. "The Supreme Court has repeatedly held that although statements obtained in violation of *Miranda* are inadmissible in the government's case-in-chief at trial, such statements, if reliable, may be used for other purposes and in other ways." *United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006)

5

(citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption [of compelled testimony], though irrebuttable for purposes of the prosecution's case-in-chief, does not require that the statements and their fruits be discarded as inherently tainted.")).[1]

## B. Requirements for Application of *Miranda* Safeguards

As suggested, two basic criteria must be met for the *Miranda* safeguards to come into play. The person must be both in custody and subject to interrogation within the meaning of *Miranda*.

### 1. Custody Requirement

Turning first to custody, it has as a necessary component "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer*, --- U.S. ---, 130 S. Ct. 1213, 1224 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984) (internal quotation marks omitted). But the situation must also be one "in which the concerns [over coercive interrogation] that powered the decision are implicated." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (internal quotation marks omitted). Thus, the relatively nonthreatening detention entailed in a routine traffic stop does not qualify as custody under *Miranda*. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Whether a person is in custody within the meaning of *Miranda* is determined from the totality of the circumstances. *Berkemer*, 468 U.S. at 440.

Last year, in *Shatzer*, the Court addressed the specific question of whether a person incarcerated as part of a sentence is in custody for purposes of *Miranda*. Answering in the negative, the Court held that "[l]awful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*." *Shatzer*, 130 S. Ct. 1213, 1224. Instead, it simply creates

---

[1] The scope of the exclusion remedy for *Miranda* violations is therefore not as broad as the exclusionary rule for Fourth Amendment violations, which precludes the use of both the direct and indirect products of an unlawful search (*i.e.*, the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun v. United States*, 371 U.S. 471 (1963)). *Elstad*, 470 U.S. at 306-07.

6

a baseline set of constraints. *Id.* In contrast, custody does arise "[w]hen a prisoner is removed from the general prison population and taken to a separate location for questioning." *Id.* at 1225 n.8. As one Court of Appeals applying *Shatzer* has held, "[t]he critical issue in this inquiry becomes whether the prisoner is isolated from the general prison population for questioning." *Fields v. Howes*, 617 F.3d 813, 822 (6th Cir. 2010). The court further explained that "[a] prisoner is in custody when he is removed from his 'normal life' by being taken from his cell to an isolated area, such as a closet or conference room, for the purpose of interrogation." *Id.* (internal citations omitted)). The custody ends when the prisoner is released back into the general prison population, away from his interrogators. *Id.*

### 2. Interrogation Requirement

As indicated, the second basis requirement for triggering *Miranda* is that the person must be subject to interrogation. Interrogation includes both express questioning and its functional equivalent—that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01 (footnotes omitted). Thus, statements to a suspect regarding the nature of the evidence against the suspect do not necessarily constitute interrogation within the meaning of *Miranda*. *United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992). "[W]hether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue." *Id.*

In addition, the questioning or its functional equivalent must be undertaken by or as an agent of law enforcement personnel. *See Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated *by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (emphasis added)); *see also*

7

*United States v. Birnstihl*, 441 F.2d 368, 370 (9th Cir. 1971) (holding that there was no evidence that a private security guard was acting as an agent of police such that he was required to issue *Miranda* warnings and noting that *Miranda* "by its own terms applies only to the actions of law enforcement officials").

## II. INAPPLICABILITY OF *MIRANDA* SAFEGUARDS TO 27 APRIL 2010 EXCHANGE

Although defendant contends that the exchange between Kaz and him on 27 April 2010 was subject to the safeguards of *Miranda* and that Kaz's failure to give the warnings renders his statements inadmissible, review shows that the exchange meets neither the custody nor interrogation requirement for application of *Miranda*. Each is discussed in turn below.

### A. Failure to Meet Custody Requirement

Defendant argues that he was in *Miranda* custody at the time of the 27 April 2010 exchange because the SHU, where he was housed, "involves solitary confinement in a small cell designed to hold one inmate with glass covering the portion of the door designed for allowing communications with others." (Def.'s Mot. 2 ¶ 2). He contends, in effect, that this form of confinement is more coercive than regular incarceration. Defendant's contention fails for several reasons.

Most basically, defendant has not shown that he meets the standard for *Miranda* custody of an inmate established in *Shatzer*. While it is undisputed that, being housed in the SHU, he was separated from the general prison population, he was not separated for purposes of interrogation. He had been placed in the SHU some seven months before the 27 April 2010 exchange because of the discovery of the shanks. Moreover, because he had been housed in the SHU for so long, his normal routine at that point was to be in the SHU. Thus, his presence in the SHU was not a coercive disruption of his then normal life, but a continuation of it.

Defendant does not dispute the controlling effect of *Shatzer* in this case. Indeed, he does not

8

mention it all.

Further, although defendant contends that the physical characteristics of a cell in the SHU were themselves coercive, he failed to elicit at the hearing evidence supporting this argument. The only evidence on that issue is testimony of Kaz (provided in response to questioning by the court) to the effect that an inmate in the SHU could not see out of the cell because the window on the door is at the top. (Tr. 84:10-12). Nor was there was any evidence introduced definitively establishing that an inmate in the SHU is in solitary confinement.

For this and the other reasons stated, the court concludes that defendant was not in custody within the meaning of *Miranda* at the time of the 27 April 2010 exchange. On this basis alone, defendant was not entitled to *Miranda* warnings.

**B.     Failure to Meet Interrogation Requirement**

Defendant argues that the interrogation requirement for application of *Miranda* is met because the interaction between Kaz and defendant was the functional equivalent of an interrogation and Kaz was acting as part of a criminal investigation into defendant's alleged weapons possession. The contention is meritless.

The interaction between Kaz and defendant was clearly not the functional equivalent of an interrogation. Among other reasons, the entire event was initiated by defendant, not Kaz. He had sent word that he wanted to see Kaz; when Kaz arrived at his cell, he initiated the conversation; and during it, he brought up the issue of the purported snitch. In a typical interrogation, of course, the official would be the initiator in all these respects.

Moreover, the gist of the exchange relating to the snitch was an effort by defendant to fish for information from Kaz regarding the purported snitch, rather than an attempt by Kaz to obtain information. He stated his view that someone had snitched on him and, when Kaz did not agree, he

9

insisted that somebody had snitched. Kaz reasonably viewed defendant as attempting to obtain information about the alleged snitch. As she testified, defendant was "trying to find out, solicit information as to an alleged snitch or whoever he -- he thinks that somebody snitched on him, trying to get me to divulge who this alleged snitch was." (Tr. 47:19 to 48:12). She therefore did not respond further. "I didn't entertain that at all. I didn't want to give any information at all." (Tr. 45:25 to 46:1). That defendant was attempting to obtain information from Kaz about the purported snitch finds support in the evidence that defendant again initiated a meeting with Kaz on 8 March 2011 to reiterate to her that he knew someone had snitched on him and that he was angry about it. (Tr. 50:2 to 52:2).

Thus, the interaction between Kaz and defendant was one voluntarily initiated by defendant for his own purpose and subject to termination at his election. Such an encounter does not constitute a *Miranda* interrogation. *See, e.g., United States v. Turner*, 28 F.3d 981, 984 (1994) (holding that *Miranda* warnings were not required where incarcerated defendant initiated a phone call to postal inspector concerning suspected postal robbery, asked questions of inspector, was not pressured to discuss robbery under investigation, could have ended the call at any time, and "could not have reasonably believed that his freedom was restricted over and above that in his normal prison setting."); *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988) (holding that *Miranda* warnings were not required where incarcerated defendant initiated two interviews with police based on his own desire to speak with them, voluntarily went to the prison interview room to do so, was free to end the interviews at any time, and was allowed to leave upon his own request).

It is, of course, true that Kaz arguably posed one question to defendant during their conversation on 27 April 2010. She stated, "'[W]hat makes you think somebody snitched on you[?]'" (Tr. 45:19-20). But she made this seeming inquiry in response to defendant's claim that

10

there was a snitch and she followed it immediately with the statement, "'I was doing my job.'" (Tr. 45:20-21). Thus, in context, her question was almost rhetorical in nature, not posed to elicit a response. Rather, it comes across as an expression of disbelief that there was a snitch based on her subsequently stated view that she, not a snitch, was responsible for discovery of the shanks. In other words, she was taking credit for the discovery in the face of defendant's contention that credit should go to a snitch. Consistent with this interpretation, she testified that by her question and following statement she was defending her ability to find the shanks: "[W]hy would I not be the one who just found the shank[s]? I mean, why would you assume that I was not competent enough to do that [?]. That's why I said, 'Why did you think there was snitches, I was doing my job.'" (Tr. 78:4-12). The court concludes that the putative question posed by Kaz was not reasonably likely to elicit an incriminating response from defendant. *See Innis*, 446 U.S. at 300-01.

The other assertions by Kaz during the conversation with defendant were not, of course, framed as questions. Nor did they deal directly with the shanks found in his wheelchair. Based on these and the circumstances previously discussed, the court finds that these other statements by Kaz also were not reasonably likely to elicit an incriminating response from defendant. *See id.*

Even if Kaz were deemed to have been interrogating defendant, which she plainly was not, defendant has failed to present any evidence that Kaz was acting in the capacity of a law enforcement officer, as required for *Miranda* to apply. *See Miranda*, 384 U.S. at 444. In fact, the evidence shows quite the contrary. Kaz was employed as a case manager and not as an investigator, as Gregory was. No evidence was presented that her duties included investigations of disciplinary violations, much less criminal offenses. As she testified, her participation in the search of defendant's wheelchair was pursuant to a duty imposed on all staff members "to ensure the safety of the institution." (Tr. 39:15-19).

11

Further, not only did Kaz's involvement in the search of defendant's wheelchair disqualify her under prison rules from participating in the prison's investigation of defendant's possession of the shanks, but neither she nor anyone else at FCI II was involved in any investigation that either the FBI or the United States Attorney's Office was pursuing in support of a criminal prosecution of defendant. As Gregory testified, there was no such investigation conducted at the facility. (Tr. 108:24 to 109:16-25). Therefore, any contention by defendant that FCI II was involved in the federal criminal prosecution beyond the initial referral in September 2009 is not supported by the evidence.[2]

For this and the other reasons stated, the court concludes that the interaction between Kaz and defendant on 27 April 2010 was not an interrogation within the meaning of *Miranda*. Thus, the event failed to meet either of the two basic requirements for application of *Miranda*—custody and interrogation. There having been no custodial interrogation entitling defendant to *Miranda* warnings, his motion to suppress the statements he made should be denied.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress (D.E. 33) be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in

---

[2] Because *Miranda* focuses on coercive circumstances at the time of the encounter with a suspect, Kaz's subsequent reporting of the conversation with defendant did not somehow retroactively constitute her a law enforcement officer and satisfy this element of *Miranda* after the fact. *See Illinois v. Perkins*, 496 U.S. 292, 295-96 (1990) (holding that an undercover law enforcement officer posing as an inmate was not required to give *Miranda* warnings to an incarcerated defendant before asking questions that could elicit incriminating information because the "essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate," coercion being assessed from the standpoint of the suspect).

which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 5 day of May 2011.

James E. Gates
United States Magistrate Judge