IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:10-CR-280-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| SHARIF SAFWAT EZZAT, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to dismiss (D.E. 34) on the grounds of double jeopardy. Defendant's memorandum was incorporated into the motion. The government filed a response in opposition as part of a collective response to several motions filed by defendant (D.E. 39 at 6-8). The motion was referred to the undersigned for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 1 Mar. 2011 Docket Entry). For the reasons stated below, it will be recommended that defendant's motion be denied.

<u>**BACKGROUND**</u>

**I.    CASE HISTORY**

Defendant, an inmate, was indicted on 18 August 2010 for possession of contraband on 13 September 2009 at the facility where he was then housed, the Federal Correctional Institution II-Medium in Butner, North Carolina ("FCI II"), in violation of 18 U.S.C. § 1791(a)(2). (Indict. (D.E. 1)). The indictment arises from the discovery of three shanks[1] in defendant's wheelchair on the alleged offense date.

---

[1] "Shanks" are homemade weapons. (*See* Transcript of Hrg. on Def.'s Suppression Mot. (D.E. 52) ("Supp. Tr.") 40:1-6).

On 31 January 2011, defendant filed the instant motion. The motion seeks dismissal of the indictment on the grounds that his prosecution violates the constitutional prohibition against double jeopardy. He contends that the prohibition is violated because he was previously punished for the same conduct in prison by being held in what was officially categorized as administrative detention for about eight months after discovery of the shanks. Administrative detention, which is discussed further below, entails, among other things, being housed in an area separate from the general prison population.[2]

On 18 May 2011, pursuant to a contested motion by defendant (*see* D.E. 60, 61, 63), the court held an evidentiary hearing on the dismissal motion. At the hearing, defendant presented the testimony of Lieutenant Scott Allen Gregory ("Gregory"), an officer with the Special Investigative Supervisor's Office at FCI II. (Transcript of Double Jeopardy Hearing ("Tr.") (D.E. 65) 5:23 to 6:5). The defendant also testified on his own behalf following advisement of rights by the court, including the right against self-incrimination. (Tr. 59:13 to 63:7). The court admitted the three exhibits offered by defendant without objection by the government (*see* Exhibit List (D.E. 64)): a 13 September 2009 Administrative Detention Order ("ADO") issued by Gregory against defendant for possession of weapons (Def.'s Hrg. Ex. 1 (D.E. 56)); a 20 April 2010 memorandum regarding "Delay in Disciplinary Process" from Gregory to the Warden ("Warden") of the Butner Federal Correctional Complex ("Complex")[3] providing information on the status of defendant's disciplinary case (Def.'s Hrg. Ex. 2 (D.E. 57)); and another 13 September 2009 Administrative Detention Order issued by Lieutenant O. Gibson against

---

[2]  At the hearing, various witnesses referred to being in the general prison population as being in "the compound." (*See, e.g.,* Tr. 70:9-14).

[3]  The Complex contains several facilities besides FCI II, including a hospital and a low security institution.

defendant for possession of weapons (Def.'s Hrg. Ex. 3 (D.E. 72)).  The court admitted[4] the sole

exhibit offered by the government:  a 2 April 2011 handwritten letter from defendant to his

family (Gov.'s Hrg. Ex. 1 (D.E. 71)).

Defendant also filed a motion to suppress (D.E. 33) in this case, which was ultimately

denied (D.E. 66).  The court held an evidentiary hearing on the suppression motion on 16 March

2011.  (*See* D.E. 45).  Portions of the testimony presented at that hearing relate to the dismissal

motion and are cited, as appropriate, in this Memorandum and Recommendation.

## II.    FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court

makes the following findings of fact:

### A.    Placement of Defendant on Administrative Detention

Defendant is a paraplegic confined to a wheelchair.  (*See* Def.'s Mot. 1 ¶ 1; Tr. 33:1-2).

On 13 September 2009, while housed at FCI II, a search of defendant's wheelchair by his case

manager, Brandi Kaz ("Kaz"), revealed two shanks inside the frame of the wheelchair and one in

the seat cushion.  (Supp. Tr. 40:17 to 42:1).  Kaz put the shanks in a secured lock box for the

Special Investigation Unit and wrote an incident report for violation of the institutional rule

against possession of weapons.  (Supp. Tr. 42:10-21).

As a result of the search, an ADO was prepared by Lieutenant O. Gibson on 13

September 2009 at 1:00 p.m. placing defendant in administrative detention in a special housing

unit ("SHU")[5] "pending investigation of a violation of Bureau regulations."  (Def.'s Hrg. Ex.

---

[4]  The court admitted the letter subject to resolution of defendant's objection that it had not been produced in discovery.  (Tr. 100:23-24).  The court now overrules that objection on the grounds that the government received the letter on the day of the hearing and was not in a position to produce it in prior discovery.  Tr. 107:14-19.  Moreover, as indicated, defendant is the author of the letter, and he cannot claim surprise as to its existence or contents.

[5]  Inmates and prison staff purportedly refer to the SHU as "the hole" (Tr. 63:20-23), and it is referred to as such at various points in the hearing testimony.

3).[6]  The ADO further informed defendant, "You are being placed in Special Housing Unit for Possession of a Weapon.  This type of behavior will not be tolerated as it disrupts the orderly running of the institution."  (*Id*.).  The ADO was witnessed by "J. Vargas," another lieutenant (Def.'s Hrg. Ex. 3).  It was provided to defendant on the same day at 1:30 p.m.  (*Id*.; Tr. 64:3-9).

Sometime after 13 September 2009, Lieutenant Gregory was reviewing Ezzat's file and noticed that it did not contain an ADO.  (Tr. 24:4-14).  Gregory then prepared an ADO and dated it 13 September 2009 and entered a time of 1:30 p.m.[7]  (Def.'s Hrg. Ex. 1).  This ADO stated, "You are being placed in Administrative Detention pending an investigation for being in possession of weapons.  You will remain in Administrative detention until the conclusion of this investigation."  (Def.'s Hrg. Ex. 1).  The ADO was witnessed by M. Mechalske and indicates that a copy of the ADO was provided to defendant at 1:35 p.m. that same day.  (*Id*.).  Neither Gregory nor Mechalske was working on 13 September 2009.  (Tr. 23:9-10; 24:4-6, 22-24).  The only copy of the ADO actually provided to defendant was the ADO issued by Gibson.  (Tr. 64:17 to 66:7).

### B.    Referral of Matter for Possible Criminal Investigation

On or about 17 September 2009, Gregory referred the incident report by Kaz to the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office ("USAO") in Raleigh, North Carolina for possible criminal prosecution.  (Def.'s Hrg. Ex. 2; Tr. 8:7-13; Supp.

---

[6]  Although not checked off on the ADO form, defendant's placement in administrative detention arguably could also have been justified as "pending a hearing for a violation of Bureau regulations" (*see* 28 C.F.R. §541.14(b)(1)) or "pending investigation or trial for a criminal act" (*see id.* § 541.14(b)(3)).

[7] The court does not find credible the suggestion that Gregory made a mistake as to the day that he was signing the order.  (*See* Tr. 24:15-16).  Rather, the circumstances indicate that Gregory intentionally backdated the ADO to the date that the search occurred.

Tr. 87:13 to 88:4; 93:24 to 94:22).  Pursuant to BOP policy,[8] the disciplinary investigation into the incident was suspended pending a decision by the FBI or the USAO on criminal prosecution and notification to BOP that it could proceed with the disciplinary process.  (Tr. 9:13 to 10:15; 101:14 to 102:14).  On 9 November 2009, the FBI notified Gregory that the United States Attorney's Office had agreed to present the case to the Grand Jury.  (Def.'s Hrg. Ex. 2; Tr. 12:15-18).  However, because BOP had not been given specific permission to proceed with defendant's disciplinary hearing, defendant remained in administrative detention.  (Tr. 102:15 to 104:9)

The policy of leaving inmates in administrative detention until receiving approval from the USAO to proceed with the prison disciplinary investigation was causing an overcrowding problem in administrative detention cells.  (Tr. 102:2-14).  In response, a decision was made that potential criminal matters would be referred directly to the USAO without involving the FBI.  (Tr. 103:13-20).  It was also decided that disciplinary proceedings would no longer have to be delayed after being referred to the USAO for criminal prosecutions, thereby allowing inmates to be returned to the general population more quickly.  (Tr. 104:22 to 105:7).

As a result of the new policy, on 20 April 2010, Gregory sent a memorandum to the Warden entitled "Delay in Disciplinary Process" stating that the shank incident on 13 September 2009 had been referred for criminal prosecution on 17 September 2009 and that on 9 November 2009 the FBI notified Gregory that the USAO had agreed to present the case to the Grand Jury.  (Def.'s Hrg. Ex. 2; Supp. Tr. 102:19-23).  Gregory also informed the Warden that "[t]he AUSA/FBI has stated that processing the incident report would not interfere with their prosecution and to proceed administratively at your discretion."  (Def.'s Hrg. Ex. 2).  Gregory further stated that "Inmate Ezzat's pending prosecution has caused a considerable delay in the

---

[8] Gregory testified that he was not aware of a written policy regarding suspension of the investigation.  However, as the court describes in more detail below, this procedure is specified by the BOP regulations at 28 C.F.R. §541.14(b)(1).

disciplinary process, and requires your approval for a UDC[9] hearing. I am requesting that [sic] your review of the incident and approval to proceed with the administrative disciplinary process." (*Id*.). The signature of the Warden appears on the memorandum, indicating that Gregory's request to proceed was approved. (*Id*.).

### C.     Defendant's Disciplinary Hearings

About six days after the date of Gregory's memorandum, around 26 April 2010, defendant received a UDC hearing. (Tr. 47:1-7). The outcome was referral of his case to a hearing before a Disciplinary Hearing Official ("DHO"). (*See* Tr. 45:4 to 46:12; 47:1-7).

On 13 May 2010, a DHO hearing was held for defendant. (Tr. 14:15-17; 47:1-7). The DHO imposed a disciplinary sanction of 60 days of disciplinary segregation, which he suspended for 180 days pending clear conduct. (Tr. 14:15-21). At the time of the hearing, defendant had been in administrative detention since 13 September 2009, a period of about eight months. Defendant was released back into the general population after the DHO hearing. (Tr. 20:3-12).

### D.     Location of Defendant's Confinement during Administrative Detention

On the date his administrative detention began, defendant was moved to the SHU at FCI II. (Tr. 19:18-22; 96:11-13). He found the cell too small for his wheelchair and otherwise unsatisfactory. (Tr. 66:8 to 67:6; 80:6-9). He banged on the door asking to be moved, breaking the glass on the cell window. (Tr. 66:8 to 67:6; 80:6-9). He was placed in another cell in the SHU and moved within three hours to the hospital in the Complex, the Federal Medical Center ("FMC" in hearing testimony). (Tr. 66:24 to 67:4; 96:11-13).

At the Federal Medical Center, defendant spent about three days in a handicap cell apparently in a non-isolated unit. (Tr. 66:25 to 67:4). He was then moved to a cell in an isolation unit, where he remained for about three weeks. (Tr. 67:5-13).

---

[9] "UDC" is an acronym for "Unit Disciplinary Committee." (Tr. 11:12-14).

Defendant was then sent to the SHU at the Low Security Correctional Institution ("LSCI")[10] at the Complex. (Tr. 67:13-20). The SHU at the LSCI served at the time as the SHU for the entire Complex. (Tr. 16:12-14; 19:23-24). Defendant apparently remained at the LSCI SHU for several months[11] until the termination of his administrative detention in May 2010. (*See* Tr. 67:13-15; 69:7-16).[12]

## III.    PRISON REGULATIONS

### A.    Administrative Detention

As indicated, the confinement status in which defendant was placed after discovery of the shanks on 13 September 2009 was officially classified as administrative detention. According to BOP regulations, "[a]dministrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population." 28 C.F.R. § 541.22 (2009).[13] The regulations authorize administrative detention when the inmate:

(1)    is in holdover status (*i.e.*, en route to a designated institution) during transfer;
(2)    is a new commitment pending classification;
(3)    poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution if his presence in the general population is continued;
(4)    is pending a hearing for a violation of Bureau regulations;

---

[10]  References in hearing testimony to the "annex" appear to be to the LSCI.

[11]  Defendant testified that he remained in the LSCI SHU for "about three or four months." (Tr. 67:13-15). The court is aware that this period is too short to reach the end of defendant's administrative detention in May 2010. But no evidence of any subsequent change of location during administrative detention was presented, and the court therefore infers there was none and defendant simply underestimated the time he spent in the LSCI SHU.

[12]  Neither party introduced records showing the successive locations where defendant was housed during his administrative detention or the duration at each such location. Although Gregory testified that defendant went from FCI II to the LSCI and then to the Federal Medical Center, he also stated that he would need to review the relevant records to be sure. (*See* Tr., *e.g.* 19:22-25, 34:11 to 35:1)  The court has therefore relied on the sequence of locations and approximate durations at each to which defendant testified as one with greater firsthand knowledge of this information.

[13]  The regulations cited herein were in effect without change throughout the period of defendant's confinement from 13 September 2009 to 13 May 2010 in administrative detention status.

(5)      is pending an investigation of a violation of Bureau regulations;

(6)      is pending investigation or trial for a criminal act;

(7)      is pending transfer;

(8)      requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (*see* § 541.23); or

(9)      is terminating confinement in disciplinary segregation and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.

*Id.* § 541.22(a).

The ADO directing that an inmate be placed in administrative detention must detail the reasons for the inmate's placement and a copy of the ADO must be delivered to the inmate unless doing so would compromise institutional security. *Id.* § 541.22(b). The delivery to the inmate must be within 24 hours unless delivery is "precluded by exceptional circumstances." *Id.*

The basic level of conditions of confinement for disciplinary segregation applies to administrative detention. *Id.* § 541.22(d). "If consistent with available resources and the security needs of the unit," the Warden must give inmates in administrative detention the same general privileges accorded inmates in the general population. *Id..* Such privileges include the opportunity for participation in an education program, library services, social services, counseling, religious guidance, and recreation. *Id.* Commissary privileges and reasonable amounts of personal property must be provided "[u]nless there are compelling reasons to the contrary." *Id.* However, an inmate must be permitted to have a radio if equipped with ear plugs. *Id.* The Warden has the discretion to limit the amount of personal property "for reasons of security, fire safety, or housekeeping." *Id.* Exercise periods must occur at least at the level for disciplinary segregation, and an inmate must be provided visiting, telephone, and correspondence privileges pursuant to the regulations governing these privileges. *Id.* (referencing 28 C.F.R. pt. 540).

As to the duration of administrative detention, the regulations provide that it is to be used "only for short periods of time except where an inmate needs long-term protection . . . or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns." *Id*. § 541.22(c)(1). An inmate must be released from administrative detention "when reasons for placement cease to exist." *Id*.

The regulations provide for a detailed system of periodic reviews of the status of inmates in administrative detention. *Id.* A Segregation Review Official ("SRO") is required to conduct a record review within three work days of placement and hold a hearing and formal review for each inmate who spends seven continuous days in administrative detention. *Id.* Thereafter, weekly reviews must be conducted and a formal hearing, with the inmate present, must be conducted every 30 days. *Id*. When an inmate remains in administrative detention beyond 30 days, BOP staff must "conduct a psychiatric or psychological assessment, including a personal interview," which must assess "the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates." *Id*. The assessment must be submitted in writing to the SRO. *Id*. These assessments must be conducted on a monthly basis "should detention continue for [an] extended period." *Id*.

## B.     Disciplinary Segregation

Although, as discussed, defendant's confinement status after discovery of the shanks was officially categorized as administrative detention, he contends that it amounted to disciplinary segregation, a different status under BOP regulations. As with administrative detention, disciplinary segregation entails separation of an inmate from the general population. It is defined as "the status of confinement of an inmate housed in a special housing unit in a cell either alone or with other inmates, separated from the general population." 28 C.F.R. § 541.21(a) (2009).

Except when certain specified circumstances warrant temporary confinement in a more secure area, "an inmate may be placed in disciplinary segregation only by order of the [DHO] following a hearing in which the inmate has been found to have committed a prohibited act" in one of the three highest categories of offenses or a repeated offense in the lowest category. *Id.* § 451.21(a); *see also id.* § 541.13 (setting out prohibited acts and the disciplinary severity scale). But "[t]he DHO may order placement in disciplinary segregation only when other available dispositions are inadequate to achieve the purpose of punishment and deterrence necessary to regulate an inmate's behavior within acceptable limits." *Id.* § 451.20(a).

"Inmates housed in disciplinary segregation have significantly fewer privileges than those housed in administrative detention." 28 C.F.R. § 541.21(a) (2009). The regulations prescribe certain basic living standards that apply during disciplinary segregation. *Id.* § 451.21(c). These standards include such matters as the conditions of living quarters, cell occupancy, clothing and bedding, food, personal hygiene, exercise, personal property, reading material, correspondence, and visits. *Id.* The regulations provide for review of the status an inmate in disciplinary segregation at prescribed intervals. *Id.* § 451.20(c).

## ANALYSIS

## I. CONSTITUTIONAL PROHIBITION AGAINST DOUBLE JEOPARDY

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. The clause applies to additional sanctions that could, "in common parlance, be described as punishment." *Hudson v. United States*, 522 U.S. 93, 98-99 (1997) (internal quotations marks omitted). However, it does not prohibit the imposition of all such sanctions, but only multiple *criminal* punishments for the same offense in successive

proceedings.[14] *Id.* Thus, to determine whether a challenged punishment falls within the double jeopardy prohibition, a court must determine whether the punishment is criminal or civil. *See* id. at 99.

The Supreme Court has recognized a two-prong test for making this determination. The first prong is whether Congress has indicated an intent that the punishment is criminal or civil. *Id.* "A court must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)).

If the court determines that Congress has indicated an intention to establish a civil penalty, it must apply the second prong. Under this prong, the inquiry is "whether the statutory scheme was so punitive either in purpose or effect as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99 (internal quotation marks omitted). The Supreme Court has instructed that the following non-exclusive factors specified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963) can provide useful guidance:

(1)     [w]hether the sanction involves an affirmative disability or restraint;
(2)     whether it has historically been regarded as a punishment;
(3)     whether it comes into play only on a finding of scienter;
(4)     whether its operation will promote the traditional aims of punishment–retribution and deterrence;
(5)     whether the behavior to which it applies is already a crime;
(6)     whether an alternative [non-punitive] purpose to which it may rationally be connected is assignable for it; and
(7)     whether it appears excessive in relation to the alternative [non-punitive] purpose assigned.

*Hudson*, 522 U.S. at 99-100 (quoting *Kennedy*, 372 U.S. at 168-169) (internal quotation marks omitted).

---

[14] "The clause consists of three separate constitutional protections. It protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *Lewis v. Pettiford*, No. 6:06-1061-GRA-WMC, 2007 WL 542735, at *6 (D.S.C. 16 Feb. 2007) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

The Supreme Court cautions, though, that these factors are to be considered in relation to the statute on its face. *Id.* at 100. Moreover, "'only the clearest proof'" suffices to override legislative intent and transform what was denominated a civil remedy into a criminal penalty. *Id.* (quoting *Ward*, 448 U.S. at 249).

With respect to the burden of proof on a claim of double jeopardy, "the defendant has the initial burden of going forward with the evidence by putting his double jeopardy claim in issue, [and] once he has made a non-frivolous showing that an indictment charges him with an offense for which he was formerly placed in jeopardy, the burden of establishing that there were two separate crimes shifts to the government." *United States v. Ragins*, 840 F.2d 1184, 1192 (4th Cir. 1988).

Defendant contends that application of both prongs of the *Hudson* test shows that his confinement between 13 September 2009 and 13 May 2010 was a criminal punishment. The court turns now to an analysis of defendant's confinement under each of the *Hudson* prongs.

## II.    INTENT BEHIND REGULATIONS

Defendant contends that although his status from 13 September 2009 to 13 May 2010 was categorized as administrative detention, it was, in fact, equivalent to disciplinary segregation. The intent behind the disciplinary segregation regulations, he argues, was to punish. He points specifically to the provision in the regulations stating that disciplinary segregation is to be imposed only when other available dispositions are inadequate to achieve "the purpose of punishment and deterrence necessary to regulate an inmate's behavior within acceptable limits." 28 C.F.R. § 541.20(a) (2009). Defendant contends that he thereby satisfies the intent prong of the *Hudson* test. The court disagrees.

The Fourth Circuit has held that "Congress intended [prison] disciplinary proceedings to be civil in nature." *United States v. Devaughn*, 32 Fed. Appx. 60, 61 (4th Cir. 2002) (reaffirming the vitality of *Patterson v. United States*, 183 F.2d 327, 328 (4th Cir. 1950) ("Criminal prosecution for the crime of escape is not prohibited under the double jeopardy clause of the fifth amendment because a convict guilty thereof has upon his recapture been subjected to discipline by the prison authorities for the violation of prison discipline involved.")). As the Fourth Circuit noted, numerous other circuit courts addressing the issue have reached the same conclusion. *Id.* (citing *United States v. Mayes*, 158 F.3d 1215, 1222 (11th Cir. 1998); *United States v. Galan*, 82 F.3d 639, 640 (5th Cir. 1996); *United States v. Brown*, 59 F.3d 102, 103-05 (9th Cir. 1995); *United States v. Hernandez-Fundora*, 58 F.3d 802, 806-07 (2d Cir. 1995); *Garrity v. Fiedler*, 41 F.3d 1150, 1152-53 (7th Cir.1994); *United States v. Newby*, 11 F.3d 1143, 1144-46 (3rd Cir. 1993).

One circuit court has explained its reasoning as follows:

> [T]he regulations authorizing administrative prison sanctions contain "no express preference" regarding whether sanctions are criminal or civil in nature. . . . [S]ee 28 C.F.R. § 541.10-23. Furthermore, they "articulate only a nonpunitive, remedial purpose," which is to ensure "that inmates may live in a safe and orderly environment," 28 C.F.R. § 541.10(a). And the fact that authority to enforce these rules "is conferred upon [an] administrative agenc[y]" the Bureau of Prisons is "prima facie evidence that Congress intended to provide for a civil sanction." Congress, therefore, intended that administrative prison sanctions be civil in nature.

*United States v. Simpson*, 546 F.3d 394, 397-98 (6th Cir. 2008) (en banc) (selected internal citations omitted).

The courts apply this principle to the prison regulations dealing with administrative detention and disciplinary segregation alike, without distinguishing between the two. For instance, *DeVaughn* involved an inmate subject to both administrative detention and disciplinary

segregation. *DeVaughn*, 32 Fed. Appx. at *1. Similarly, as can be seen, the *Simpson* court cited

to the regulations appearing at 28 C.F.R. § 541.10 through § 541.23 (2008) collectively, which

include the regulations on both administrative detention and disciplinary segregation. *Simpson*,

546 F.3d at 397-98. Therefore, for the first prong of the *Hudson* test, the court need not

determine whether defendant's confinement was actually pursuant to the disciplinary segregation

regulations.

In fact, there is a question whether the administrative detention regulations are subject to

*Hudson* at all. Notwithstanding the foregoing case law, administrative detention is not treated as

a disciplinary sanction under the regulations, but rather simply an administrative procedure for

the separation of an inmate from the general population for a variety of purposes, many of them

having nothing to do with disciplinary matters. *See* 28 C.F.R. § 541.22(a) (2009) (authorizing

administrative detention for, *e.g.*, prisoner transfers, new prisoner classification, inmate

protection at the inmate's request); (*see also* Tr. 31:16 to 32:21(testimony by Gregory that

administrative detention is not punishment)). Indeed, administrative detention is not specified as

an available sanction in the regulation that provides for available disciplinary sanctions. *See id.*

§ 541.13 (2009). Again, though, the court need not resolve this precise issue (just as other courts

have not) because the intent behind the administrative detention regulations is clearly civil when

the *Hudson* test is applied.

## III.   PURPOSE AND EFFECT OF REGULATIONS

As to the second *Hudson* prong, defendant points to circumstances of his confinement

from 13 September 2009 to 13 May 2010 that he contends show its purpose and effect was

criminal punishment. He relies largely on the notion that these circumstances rendered his

confinement equivalent to disciplinary segregation, rather than administrative detention. While

defendant's confinement undoubtedly did involve affirmative restraints on him, such as separation from the general prison population and limitations on privileges, *see Hudson*, 522 U.S. at 99 (*Kennedy* factor (1)), the court disagrees that the purpose or effect of his confinement and the attendant circumstances was criminal punishment.

A fundamental flaw in defendant's argument is the assumption that disciplinary segregation or its equivalent is necessarily criminal punishment. As discussed, Congress's intent is that prison disciplinary proceedings be civil in nature. Therefore, confinement that has the hallmarks of disciplinary segregation is not by that fact alone criminal punishment.

Moreover, review of the particular circumstances cited by defendant shows that they did not give defendant's confinement the character of disciplinary segregation as distinct from administrative detention. Nor did these circumstances otherwise transform the purpose and effect of his confinement into criminal punishment.

One circumstance defendant points to is the statement in the ADO issued by Gibson that "[t]his type of behavior will not be tolerated as it disrupts the orderly running of the institution." (Def.'s Hrg. Ex. 3). Defendant argues that this language is of a "scolding nature" and thereby indicates an intent to punish him. (Tr. 113:11-16).[15] But, as the government argues (*see* Tr. 122:21 to 124:2), this statement merely reiterates the policy under the regulations that the purpose of inmate discipline is to ensure safety and order: "So that inmates may live in a safe and orderly environment, it is necessary for institution authorities to impose discipline on those inmates whose behavior is not in compliance with Bureau of Prisons rules." 28 C.F.R. § 541.10(a) (2009); *accord* 28 C.F.R. § 541.10(b)(2) (2009) (citing as a general principle that

---

[15] Notably, it is not part of defendant's argument and there is no evidence indicating that defendant was singled out for purportedly adverse treatment among similarly situated inmates. In particular, there is no allegation or showing that he was treated differently from other inmates, if any, in administrative detention for reasons having nothing to do with discipline.

"[s]taff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within Bureau rules and institution guidelines and to promote a safe and orderly institution environment"). Thus, the language in Gibson's ADO is not indicative of punitive intent, but is consistent with an alternative, non-punitive purpose.[16] *See Hudson*, 522 U.S. at 99 (*Kennedy* factor (6)).

This conclusion is reinforced by Gregory's testimony that the Warden considered defendant's placement in a SHU necessary for reasons of safety. "I know that he was trying to get back to general population, but because of the security and safety concerns of him being in general population and having been found with weapons and being part of a gang member, that it was not–or the Warden didn't feel like it was safe for him to be out there at that time." (Tr. 33:17-22).[17]

Defendant also argues that the conditions of his confinement show that it was criminal punishment. He repeatedly claims, for example, that he was held in solitary confinement. (*See, e.g.*, Def.'s Mot. 4 ("Mr. Ezzat was placed in disciplinary segregation in the form of solitary confinement for approximately nine months . . . ."); Tr. 109:8-15; 109:22 to 110:1; 116:7-15). The court understands defendant to be asserting that he was held in a small cell by himself. (*See, e.g.*, Def.'s Mot. 2 ¶ 3; Tr.115:24 to 116:6).

But the record does not support this contention. The evidence does not definitively show that defendant was ever housed in a cell by himself except for the several hours he spent in the SHU at FCI II on the first day of his administrative detention. Even if he had been housed by

---

[16] Defendant makes the related assertion that Gregory issued the second ADO not to fill a paperwork gap as Gregory testified, but rather to mitigate the punitive tone in the first ADO. Because the court concludes that the language does not communicate a punitive intent, it finds this related argument baseless as well.

[17] In a similar vein, Gregory testified that administrative detention is not punishment. (Tr. 31:16 to 32:21). *See Hudson*, 522 U.S. at 99 (*Kennedy* factor (2)). And, as review of the administrative regulations shows, there is no scienter requirement for placement in administrative detention. *See* 28 U.S.C. § 541.22(a); *Hudson*, 522 U.S. at 99 (*Kennedy* factor (3)).

himself on a long-term basis, the regulations previously cited provide that housing an inmate by himself is permissible for administrative detention (as well as disciplinary segregation). *See* 28 U.S.C. §§ 541.21(a) (2009) (disciplinary segregation), 541.22 (2009) (administrative detention).

As to the size of defendant's cell, he complained in his testimony about the size of only the cell at the SHU at FCI II, where, again, he stayed only a matter of hours. He made no such complaint about the cells he occupied at the Federal Medical Center.[18] At the LSCI, he said his cell was "two cells combined together with two lower bunks to put two guys in wheelchairs in." (Tr. 67:21-25). The court finds that neither the occupancy levels of those cells in which defendant was housed or their size gave his confinement in them a punitive character.

Defendant also contends that the limited number of privileges he was afforded in the SHU at the LSCI indicates his confinement there was criminal punishment. The issue of privileges in the SHU at FCI II is seemingly immaterial because he was there only a matter of hours. He makes no complaint about privileges at the isolation unit at the Federal Medical Center. Thus, defendant raises the issue of privileges for only a portion of the period of administrative detention.

As to the LSCI, defendant testified that visitation, telephone usage, commissary access, law library access, and recreation were all substantially more limited than in the general population. (Tr. 68:8 to 70:8; 71:7-19; 78:24 to 79:19). He also said that, unlike when in the general population, he had no access to a computer or television. (Tr. 79:15-19). Defendant further testified that except when at recreation for an hour each day he was confined to his cell, in contrast to being able to move around the facility relatively freely to various activities when in

---

[18] His sole complaint about the housing at the Federal Medical Center was that the cell in the isolation unit lacked a shower. (Tr. 67:5-13). The absence of the convenience of having a shower in that cell is not evidence of criminal punishment.

the general population. (Tr. 68:18-23; 70:17 to 71:6). Gregory confirmed that inmates in administrative detention spend much of the day in their cells. (Tr. 18:12-16; 18:21 to 19:7).

But the limitations placed on defendant are among those permitted by the regulations applicable to administrative detention. For example, as noted, it is only "[i]f consistent with available resources and the security needs of the unit" that inmates in administrative detention are provided the same general privileges given to inmates in the general population. 28 C.F.R. § 541.22(d) (2009). The regulations, of course, also permit limitations on specific privileges, such as visitation, correspondence, and telephone usage, under certain circumstances. *See, e.g.*, *id.* §§ 540.50(c) (2009) (providing that an inmate in detention may have his visitation restricted when he "has . . . acted in a way that would reasonably indicate that he . . . would be a threat to the orderliness or security of the visiting room); 540.100(a) (2009) ("[I]nmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public."); 540.15 (2009) (specifying the circumstances under which the Warden may restrict an inmate's general correspondence).

To support the argument that his confinement amounted to disciplinary segregation, defendant points to testimony by Gregory that the only difference in privileges between the two statuses is that in disciplinary segregation there is no right to have a radio or access to snacks or cakes from the commissary. (Tr. 48:4-16). This testimony does not, of course, purport to address such matters as the differences in legal significance between the two statuses, any potential for greater limitation of privileges in disciplinary segregation, or the privilege situation of individual inmates. But even taking the testimony at face value, the record shows that

defendant's confinement had neither of the posited hallmarks of disciplinary segregation. Defendant testified to the effect that he had access to both a radio and snacks. (Tr. 68:14-16).

In addition, defendant admits that at least one of his privileges was not restricted. He testified that he was able to write letters. (Tr. 69:17-21; 78:20-23).

While at the hearing defendant decried the limited privileges and cell-focused life he had in the LSCI SHU, in a letter to his family in 2011, he expressed largely favorable comments about the seemingly similar experience he was having in the SHU at FCI II in 2011. He stated in part:

> I'm well rested and very comfortable. I love the relaxation mode I am in, I think I can just sit in the hole for the rest of my time. . . . Was boring in the beginning but I'm used to it now it becomes normal it's safe. You don't have to watch your back all the time or get in some problems or politics, I am in my own zone,

(Gov.'s Hrg. Ex. 1 at 2 (punctuation original); *see* Tr. 93:10 to 95:21). Defendant explained the favorable tone of his comments as an attempt by him to assuage his family's concerns about his wellbeing (*see* Tr. 96:25 to 97:11), but the court finds his comments merit some weight nonetheless on the impact of isolation and diminished privileges in a SHU.

Moreover, defendant's own conduct appears to have prompted at least some of the limitations imposed. As discussed, his admitted conduct at the outset included the breaking of the window on his cell at the SHU in FCI II. (Tr. 66:8 to 67:6; 80:6-9). Gregory also testified that defendant's conduct was disruptive when he was at the Federal Medical Center. (Tr. 32:22 to 33:7). In addition, he testified that defendant may have threatened suicide and such threats could account in part for his move to the Federal Medical Center. (Tr. 33:7-11).

Testimony by defendant himself suggests that the limitations on his privileges were tied to his behavior in the SHU. He testified:

> You get everything took away from you, your clothes, your personal property. You could only get maybe a radio, some coffee, maybe some peanut butter and some crackers. That is if they like you. *You behave and they act nice*, they would give you that, and some writing materials.

(Tr. 68:12-17) (emphasis added). Thus, good conduct meant fewer limitations on privileges. This testimony undermines the notion that restrictions on defendant's privileges were retribution for his prior alleged possession of the shanks. *See Hudson*, 522 U.S. at 99 (*Kennedy* factor (4)).

The court concludes that the limitations on defendant's privileges during his administrative detention were not excessive in relation to their avowed purpose of maintaining safety and discipline. *See Hudson*, 522 U.S. at 99-100 (*Kennedy* factor (7)). For this and the other reasons discussed, the limitations on defendant's privileges did not constitute criminal punishment.

Defendant also asserts that the length of his confinement rendered it punitive in nature. However, defendant has not cited nor has the court found any applicable regulations that preclude the specific period of time defendant was held in administrative detention. While 28 C.F.R. § 541.22(c)(1) does expressly state that "administrative detention is to be used only for short periods of time," the regulations also provide for longer periods based upon, *inter alia*, the broad justification of "exceptional circumstances, ordinarily tied to security or complex investigative concerns." 28 C.F.R. § 541.22(c)(1) (2009). Defendant has failed to present evidence demonstrating that his extended period of administrative detention was not justified under this exception. Indeed, the fact that three weapons were found in his wheelchair tends to substantiate that security concerns warranted defendant's extended removal from the general population. Further, the regulations clearly contemplate extended periods given that they provide a detailed process for review of inmate status at 30-day intervals. *Id.*

Defendant also argues that the justification cited in the ADOs for his administrative detention–pendency of an investigation into violation of BOP regulations–was baseless, leaving punishment as the real reason. This justification was purportedly baseless because no investigation of regulations violations was, in fact, undertaken until toward the end of his confinement. Although Gregory testified that the investigation was suspended in accordance with the practice at the time, defendant points out that Gregory could cite to only an unwritten policy as the basis for the suspension.

In actuality, though, the suspension of the investigation into defendant's violation of the regulations was required by the regulations themselves. Pursuant to 28 C.F.R. § 541.14, "[w]hen it appears likely that the incident [involving violation of a BOP regulation] may be the subject of criminal prosecution, the investigating officer *shall suspend the investigation*, and staff may not question the inmate until the Federal Bureau of Investigation or other investigative agency interviews have been completed or until the agency responsible for the criminal investigation advises that staff questioning may occur." 28 C.F.R. §541.14(b)(1) (2009) (emphasis added). In accordance with these provisions, the investigation into whether defendant violated BOP regulations was properly suspended until on or about 20 April 2010 when BOP received approval from USAO to proceed. (Def.'s Hrg. Ex. 2). The proceedings then moved forward with relative dispatch: as indicated, he received his UDC hearing about six days later, around 26 April 2010, and his DHO hearing about two weeks after that, on 13 May 2010. (Tr. 47:1-7; *see also* Tr. 13:7-11 (Gregory's testimony that the DHO hearing normally comes two to four weeks after the UDC hearing).

Thus, considering the circumstances of defendant's confinement from 13 September 2009 until 13 May 2010, both individually and collectively, pursuant to *Hudson*'s second prong,

including specifically pursuant to the salient factors identified in *Kennedy*, the court finds that defendant has failed to offer proof sufficient to override the legislative intent behind the regulations at issue and to show that as applied to him they were transformed from the intended civil remedy into a criminal penalty. *See Hudson*, 522 U.S. at 100. Because his confinement did not constitute criminal punishment, his prosecution for possession of the shanks does not subject him to double jeopardy. His motion to dismiss on those grounds should accordingly be denied.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to dismiss (D.E. 34) for double jeopardy be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 7th day of July 2011.

James E. Gates
United States Magistrate Judge